UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CLIDE WILSON,

                              Petitioner,

            v.                                          9:14-CV-897 (GLS/ATB)


STEPHEN RACETTE,

                              Respondent.

_____

CLIDE WILSON, Petitioner Pro Se
PRISCILLA I. STEWARD, Ass't Att'y Gen., for Respondent

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

Petitioner, incarcerated at Clinton Correctional Facility, filed the instant habeas

corpus petition, pursuant to 28 U.S.C. § 2254, on July 21, 2014. This matter was

referred for Report and Recommendation by the Honorable Gary L. Sharpe, Chief

U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

Petitioner challenges a January 20, 2011 judgment of conviction, after a jury

trial in Greene County Court. He was convicted of two counts of Criminal Possession

of a Controlled Substance in the Third Degree (New York Penal Law ("Penal Law") §

220.16 (1); and one count of Criminal Sale of a Controlled Substance in the Third

Degree (Penal Law § 220.39 (1)). Petitioner was sentenced to an aggregate 18-year

prison term, followed by two years of post-release supervision. On November 1,

2012, the Appellate Division, Third Department, unanimously affirmed the judgment

of conviction, and on November 22, 2013, the New York Court of Appeals denied

leave to appeal.  *People v. Wilson*, 100 A.D.3d 1045, 952 N.Y.S.2d 837 (3rd Dept. 2012), *lv. denied*, 22 N.Y.3d 998, 981 N.Y.S.2d 4 (2013).

Petitioner raises the following grounds in support of this application:

(1)    Petitioner was denied the effective assistance of counsel. (Pet. at 5-8) (Dkt. No. 1).

(2)    Petitioner's Sixth Amendment right to confront witnesses against him was violated when the trial court limited the scope of cross-examination. (Pet. at 11).

Respondent has filed an answer, together with a memorandum of law and the pertinent state court records.[1] (Dkt. Nos. 10 – 10-5).  For the following reasons, this court will recommend denial and dismissal of the petition.

## I.    Relevant Facts and Procedural History

Respondent's Memorandum of Law (Dkt. No. 10-1) and the Third Department, Appellate Division's November 1, 2012 decision in *People v. Wilson*, 100 A.D.3d 1045, 952 N.Y.S.2d 837, both provide detailed recitations of the factual background and procedural history of the instant habeas action.  This court will provide a brief

---

[1] Respondents filed a Bates-stamped state court record on appeal (cited herein as "SR"), in addition to transcripts from five pre-trial hearings and the trial itself.  (Dkt. Nos. 10 to 10-5; 11 to 11-3).  The pre-trial hearing transcripts are separately paginated, and citations to these proceedings will be identified in this Report & Recommendation by their docket number, hearing date, and individual pagination.  The trial transcript consists of six consecutively paginated volumes, except for certain portions, including a partial transcript of Dennis Foster's testimony (key to this proceeding) that were prepared by a different court stenographer and thus use a wholly different pagination system.  In their memorandum of law, Respondents cited the trial transcript according to "the PDF pagination," a method which became unworkable once the 1,000 plus page transcript was filed on CM/ECF.  To resolve the issue, this court will cite to the volume and page of the trial transcript where possible, and to the individual pages of the Foster testimony as necessary.  To avoid these difficulties in the future, Counsel is reminded of her obligation to provide a record that is sequentially numbered or otherwise "easily identifiable" in accordance with L.R. 72.4(c).

overview of this background here, elaborating on the details below, to the extent pertinent to the analysis of the claims raised in the petition.

Petitioner's conviction was the result of two controlled purchases of crack cocaine by a confidential informant ("CI") on August 18, 2009 and August 26, 2009 in the Towns of New Baltimore and Athens, New York . The CI participated in the drug buys and testified against petitioner in exchange for a favorable plea agreement in several pending criminal proceedings. Both purchases were observed from a distance by undercover investigators from the New York State Police Community Narcotics Enforcement Team ("CNET"). These investigators testified at petitioner's trial. The CI also wore a body wire during both purchases, resulting in audio recordings of the drug purchases that were played for the jury at petitioner's trial.

## A.    Pre-Trial

Petitioner turned himself in after an arrest warrant was issued. Petitioner was represented by Dominic Cornelius, an attorney for the Greene County Public Defender's office, at a bail application hearing held on December 8, 2009. (Dkt. No. 11 at 1-9, Bail Application Hearing Transcript ("BT") at 1-9).

At the hearing, Attorney Cornelius argued in favor of petitioner's release on bond in light of his long-term residence within the county, minor children under his care, and employment history. (BT 2-4)  As support for the bail application, Cornelius noted that petitioner was a lawful resident of the United States whose immigration status would be adversely affected by a conviction, and therefore petitioner had "an impetus to appear in court at all times and contest the charges rather than risk having a

hearing go forward in his absence." (BT 3).

Attorney Cornelius also challenged the strength of the case against petitioner, noting that "[t]his wasn't a case where an officer was looking over the shoulder of the CI. He was a considerable distance away, and I questioned and still would continue to question the police officer's identification . . . ." (BT 3). The court ultimately set bail in the amount of $25,000 cash, $50,000 bond. (SR 22).

At some point after the December 8, 2009 bail hearing, Attorney Cornelius and the Greene County Public Defender's office ceased representing petitioner. At least three other attorneys appeared on petitioner's behalf leading up to trial.[2] For example, after reserving decision on petitioner's bail application, the court issued a written order granting bail on December 14, 2009 that listed Frederick Korkosz as petitioner's counsel. (SR 22). Attorney Korkosz also represented petitioner at his January 26, 2010 arraignment. (Dkt No. 11 at 10-13, Arraignment Hearing Transcript at 1-4). Petitioner terminated Attorney Korkosz's representation and retained Dennis Schlenker, who represented petitioner at a April 20, 2010 hearing to seek the identification of the CI in this case. (Dkt. No. 11 at 14-23, Discovery Motion Hearing ("DT") at 1-10). Attorney Schlenker withdrew as counsel shortly thereafter, upon learning that the CI was Dennis Foster, a former client.[3] (Dkt No. 11 at 24-31, Withdrawal Hearing at 1-8). Petitioner ultimately retained John Sandleitner as

---

[2] An attorney named Robert White was also appointed counsel at some point prior to the trial, but did not appear in court, and the extent of his representation is unclear. (SR 27).

[3] Petitioner does not raise any conflict of interest claims arising from Attorney Schlenker's representation.

4

counsel, who appeared at trial.

Attorney Sandleitner represented petitioner at a Sandoval hearing[4] on January 4, 2011. (Dkt. No. 11 at 32-111, Sandoval Hearing Transcript ("ST") at 1-80). At the start of the hearing, Attorney Sandleitner put on the record the current plea offer from the District Attorney, of two years of incarceration with two years of post-release supervision. (ST 2-3). Attorney Sandleitner informed the court that he "extended that offer to my client yesterday when I met with him in this building downstairs. He is respectfully rejecting that offer. I also advised him of the possible sentence and exposure, so he has taken that into consideration, as well." (ST 2-3).

## B.    The Trial

Petitioner proceeded to a jury trial on January 11, 2011 before Greene County Court Judge George J. Pulver, Jr. Just prior to jury voir dire, the parties agreed on a plea agreement in which defendant would serve one and a half years of incarceration, with one year of post-release supervision, and the waiver of petitioner's right to appeal. (Dkt. No. 11, Vol. 1. Trial Transcript ("TT") at 18-20). Judge Pulver refused to approve this agreement. (TT 20).

During the trial, the prosecution called several law enforcement witnesses involved in the controlled drug purchases and the resulting chain of evidence. This included Investigator Joseph McCarthy, Investigator Christopher Lapham,

---

[4] In New York State courts, a Sandoval hearing is held to determine the extent to which a defendant will be subject to impeachment by cross-examination about prior convictions if he testifies. *See People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849 (1974); *People v. Dokes*, 79 N.Y.2d 656, 660, 584 N.Y.S.2d 761 (1992).

Investigator Walter Trojanek and Trooper Tate Higgins of CNET; Investigator Lance
Aguiar of the Greene County Bureau of Criminal Investigation; and Investigator
William Moloney of the New York State Police. (TT at 211-546). The prosecution
also called Heath Wood, a convicted felon and former roomate of petitioner, and
Dennis Foster, the CI. The defense did not call any witnesses. Because the habeas
corpus petition focuses on Foster's testimony, this court will summarize this evidence
in greater detail.

### 1. Direct Testimony and Cross-Examination of Dennis Foster

On January 18, 2011, Dennis Foster began his direct testimony. (Dkt No. 11-1
at 333-420, First Foster Testimony Transcript ("Foster") at 1-88). Foster testified
that he was an active drug user who had used crack cocaine within the past 21 days.
(Foster 7). He also testified that he committed approximately a dozen crimes to
support his addiction, including stealing money from his mother. (Foster 8). Foster
further testified that in order to obtain favorable treatment in three outstanding
criminal cases, that he agreed to become a confidential informant for the New York
State Police, and buy drugs from petitioner. (Foster 10). Foster described his prior
contacts with petitioner and identified him at the defense table. (Foster 10-11).

Foster also described the preparation for his two drug purchases from petitioner.
On August 18, 2009, Foster met with CNET officers at the State Police Barracks in
Coxsackie, New York, and was given a recording device that was "probably half the
size of a cigarette pack." (Foster 12). Foster testified that he called petitioner on his
cell phone to arrange a meeting, and then traveled with Inspector McCarthy to the

property where petitioner was living. (Foster 14). Foster testified that he entered the property unaccompanied, gave petitioner $100 that had been provided by CNET, and went outside with petitioner. (Foster 16). Foster said that petitioner used a machete to clear weeds from an overgrown section of the property, and then petitioner instructed Foster to pick up two small plastic bags each containing a small piece of crack cocaine. (Foster 17-18). According to his testimony, Foster then returned to the vehicle, and handed the crack cocaine over to Inspector McCarthy. (Foster 18). Foster also listened to portions of the audio recording of this drug buy and described for the jury what was happening on the tape.

Foster provided similar testimony regarding his August 29, 2009 drug purchase, including a description of the pre-buy meeting with CNET and contacting petitioner by cell phone. (Foster 24-26). Foster said that he traveled with Trooper Tate to the home of Jeff and Shannon Dean. (Foster 25). Foster then described meeting petitioner on the front porch of the property, petitioner's removal of two pieces of crack cocaine from under a couch cushion, and the resulting drug sale. (Foster 27). As before, Foster listened to an audio recording and described for the jury what was happening at certain points of the transaction. (Foster 29-32).

Attorney Sandleitner then cross-examined Foster. This included questioning regarding Foster's lengthy history of drug abuse; his previous purchase of crack cocaine from petitioner's housemate, Heath Wood; and the preparation for Foster's testimony, including meetings with the district attorney's office. (Foster 36-42).

Sandleitner also questioned Foster about the scope of his Confidential

Informant Agreement ("CI Agreement"), and offered the document into evidence. (Foster 44-47). Foster testified that he signed the April 9, 2009 agreement without the assistance of legal counsel, and that it required him to plead guilty to two Petit Larcenies and pay full restitution in all outstanding cases against him. (Foster 44).

Sandleitner further questioned Foster about the details of his prior criminal convictions and pending criminal charges. This included several crimes alleged to have occurred after execution of the CI Agreement. Sandleitner highlighted a December 20, 2010 charge of Grand Larceny in the Fourth Degree, made eight months after the CI Agreement, alleging unauthorized use of a credit card. (Foster 51-55). Upon questioning, Foster admitted that the credit card belonged to his mother. (Foster 53). Because these charges were still pending, the trial court offered Foster an opportunity to confer with counsel before answering. Foster declined. (Foster 54).

Next, Attorney Sandleitner questioned Foster about a burglary charge stemming from the theft of a television from a residence in December 2009. (Foster 56). Foster testified that he took the television after a dispute with a crack dealer named "Anthony." (Foster 57). The court sustained the prosecution's objection to further questioning related to this charge, including the crack dealer's last name. (Foster 57-58). Later, the court sustained the prosecution's objections to questions about the manufacturer and model of the television, and the actual owner of the house where the alleged burglary occurred. (Foster 70).

Sandleitner also asked about pending charges related to fraudulent checks that Foster was charged with passing at a Family Dollar retail store. (Foster 63). The court

sustained the prosecution's objections to further details about these charges, including the distance from the Family Dollar to Foster's mother's restaurant. (Foster 64). Outside the presence of the jury, the court ruled that such details would only distract from the actual issues in the case, and would tend to confuse the jury. (Foster 70-76).

After discussions with counsel, the court permitted petitioner's counsel to question Foster about prior convictions and pending charges that had probative value as to credibility, both felonies and misdemeanors, as well as traffic infractions. (Dkt. No. 11-2 at 3-7, Vol. IV TT at 391-395). The court excluded questions about outstanding warrants and arrests which did not result in convictions. (TT 417). The court also restricted petitioner's counsel's ability to discuss the details of the offenses, including any earlier plea agreements or reduction of charges. (TT. 406). Petitioner was present during all these discussions. (TT 391).

In light of the potential for self-incrimination in pending criminal matters, Foster was given another opportunity to confer with his attorney, Dominic Cornelius of the Greene County Public Defender's Office. (TT 410-412). Upon seeing Attorney Cornelius in the courtroom, petitioner notified his current counsel that Cornelius had previously represented him. (TT 413). When the issue was brought to the court's attention, the court questioned Cornelius about this prior representation. (TT 415-17). Cornelius had no recollection of representing petitioner, and did not recognize him, but believed that he may have prosecuted petitioner while a member of the District Attorney's office. (TT 415). When questioned, Cornelius informed the court that he had not had any discussions with his client or the Greene County District Attorney's

office regarding petitioner. (TT 416). Following this inquiry, Foster's cross-examination recommenced, and included questions regarding prior guilty pleas for Criminal Possession of a Controlled Substance, Obstruction of Governmental Administration, and Scheme to Defraud. (TT 418-23).

This cross-examination continued into the next day, January 19, 2011. (Docket No. 11-2 at 66-196, Second Foster Testimony Transcript ("Foster II") at 1-131). Prior to Foster's testimony, the court again addressed the prior representation of petitioner by Dominic Cornelius and the possible conflict of interest. (Foster II 7-27). Petitioner offered correspondence between Attorney Cornelius and the Greene County District Attorney's office regarding petitioner's case dated July 13, 2010. (Foster II 7). Petitioner's counsel argued that this demonstrated an actual conflict of interest, since Dennis Foster had been operating as a confidential informant with the New York State Police as of April 2009. (Foster II 8). Concluding that it was likely that plea agreements were offered to petitioner during that time, petitioner's counsel argued that any concurrent representation of petitioner and Foster would taint any advice from Cornelius related to a plea deal. (Foster II 10). Petitioner did not offer any evidence that any plea offers were made during Cornelius's representation.

To resolve the issue, the trial court again questioned Attorney Cornelius in chambers. Based upon his review of records from the Greene County Public Defender's Office, Attorney Cornelius reported that the Public Defender's office was considered as replacement counsel after Attorney Schlenker withdrew as counsel. The Public Defender's office declined due to an unspecified conflict. (Foster II 23-25).

Cornelius also stated that, to his knowledge, the Greene County Public Defender's Office had provided no substantive representation to petitioner. The trial court concluded that there had been no contact between the Greene County Public Defender's office and petitioner, aside from a "passing in the night." (Foster II 26). The cross-examination of Dennis Foster continued.

Petitioner's counsel questioned Foster about his relationship with Heath Wood, who had previously been arrested for selling crack cocaine. (Foster II 29-32). Foster also answered questions regarding the extent of his informant relationship with CNET, and the details of his August 18, 2009 and August 26, 2009 drug purchases. (Foster II 34). Petitioner's counsel challenged Foster's prior testimony regarding phone calls made to petitioner, Foster's handling of the buy money, his use of the recording device, and his discussions with the officers prior to the sale. (Foster II 60-65). Attorney Sandleitner also had Foster mark up photographs of the purchase sites to indicate where the purchase took place and the location of the observing officers. (Foster II 65-66).

### C.    Post-Trial Proceedings

As noted above, the jury returned a guilty verdict for two counts of Criminal Possession of a Controlled Substance in the Third Degree, and one count of Criminal Sale of a Controlled Substance in the Third Degree. (SR 15). Petitioner was sentenced to a total of 18 years imprisonment. With the assistance of new counsel, petitioner filed a direct appeal, arguing that the jury verdict was against the weight of the evidence, that the trial court improperly limited petitioner's cross-examination,

11

that the court improperly admitted testimony concerning petitioner's prior bad acts, that the jury charge was improper, and that petitioner had ineffective assistance of counsel while represented by Attorney Cornelius. (SR 189-207). The Appellate Division, Third Department affirmed the conviction, and leave to appeal was denied by the New York Court of Appeals. *Wilson,* 100 A.D.3d 1049, 952 N.Y.S.2d at 842 (3d Dep't 2012), *lv. denied,* 22 N.Y.3d 998, 981 N.Y.S.2d 4 (2013).

On January 2, 2014, petitioner filed a pro se motion to vacate the judgment of conviction in Greene County Court pursuant to New York Criminal Procedure Law § 440.10, arguing that his arraignment was held in violation of territorial jurisdiction, and was based upon a defective criminal complaint. (SR 845-46). The County Court denied the motion on March 7, 2014 on both procedural and substantive grounds. (SR 874). Petitioner did not appeal.

### D. The Federal Habeas Petition

In his pro se habeas petition dated August 3, 2012 (Dkt. No. 1), petitioner raises the following grounds for habeas relief: (1) Attorney Cornelius provided ineffective assistance during his bail application hearing and an indeterminate "crucial period" thereafter, resulting in petitioner's rejection of a plea agreement that would have offered him a more favorable sentence; and (2) the trial court limited the scope of the cross-examination of Dennis Foster in violation of the Sixth Amendment, preventing petitioner from demonstrating the complete theory of his defense to the jury. For the reasons set forth below, this court concludes that none of these claims has merit and recommends that the petition be denied and dismissed.

12

## II.    Generally Applicable Law

### A.    The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")
provides that, when a state court has adjudicated the merits of a petitioner's claim, a
federal court may grant an application for a writ of habeas corpus only if "the
adjudication of the claim (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established federal law, as determined by the
Supreme Court of the United States; or (2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence presented in the State
court proceeding."  28 U.S.C. § 2254(d).  *See also, e.g.*, *Brown v. Alexander*, 543 F.3d
94, 100 (2d Cir. 2008)*; Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001).  This is a
"difficult to meet," and "highly deferential standard for evaluating state-court rulings,
which demands that state court decisions be given the benefit of the doubt."  *Cullen v.
Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (citations omitted).

A state-court decision is "contrary to" clearly established federal law if the state
court's conclusion on a question of law is "opposite" to that of the Supreme Court or
if the state court decides a case differently than the Supreme Court's decision "on a set
of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).
A state court decision involves an unreasonable application of clearly established
Supreme Court precedent if it correctly identifies the governing legal principle, but
unreasonably applies or unreasonably refuses to extend that principle to the facts of a
particular case.  *Id.*

Under the AEDPA, a summary disposition by a state court constitutes a disposition "on the merits." *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *see also Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) (noting that where state courts summarily deny relief on the merits, "we must focus on the ultimate decisions of those courts, rather than on the courts' reasoning"). A federal court reviewing a Section 2254 claim must determine "what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 88.

A state court's factual findings are presumed correct under the AEDPA, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## III. <u>Effectiveness of Trial Counsel</u>

The petitioner claims that one of his attorneys, Dominic Cornelius of the Greene County Public Defender's Office, had a conflict of interest during his brief representation of petitioner at a bail application hearing prior to arraignment, as well as during some indeterminate period thereafter. The alleged conflict of interest stems from Attorney Cornelius' representation of the prosecution's primary witness against petitioner, Dennis Foster. (Pet. at 5-8). Petitioner further alleges that this conflict

resulted in trial counsel rendering faulty advice regarding plea offers from the prosecution, and petitioner's rejection of those offers leading up to his trial. This court finds that petitioner has failed to establish that the state courts' rejection of these ineffective-assistance claims on the merits involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Therefore, plaintiff's ineffective assistance of counsel claim should be dismissed.

### A.     Applicable Law

The general standards for ineffective assistance of counsel were articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-696 (1984). This test requires an affirmative showing that counsel's performance fell below an objective standard of reasonableness, and that prejudice resulted because there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 688, 694. An ineffective-assistance claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011) (citing *Strickland*, 466 U.S. at 697).

When assessing counsel's performance, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (quoting *Strickland*, 466 U.S. at 689). Courts should not use hindsight to second-guess sound tactical decisions made by attorneys. *McKee v. United States*, 167 F.3d 103, 106 (2d

Cir. 1999) (citing *Strickland*, 466 U.S. at 689).

In evaluating the prejudice component of *Strickland*, a "reasonable probability" that the outcome of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Santone v. Fischer*, 689 F.3d 138, 155 (2d Cir. 2012) (citing *Strickland*, 466 U.S. at 693). Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight. *McKee v. United States*, 167 F.3d at 106-107 (citing, *inter alia*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

The "AEDPA requires the federal habeas court to accord deference to the state court's ruling on claims of ineffective assistance of counsel." *Santone v. Fischer*, 689 F.3d at 154. As the Supreme Court stated in *Harrington v. Richter*, 562 U.S. at 105:

> The standards created by Strickland and § 2254(d) are both "highly deferential," . . . *and* when the two apply in tandem, review is "doubly" so. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

(citations omitted).

Petitioner raised both federal and state constitutional claims before the New York appellate courts. The standard for ineffective assistance of counsel under the New York Constitution differs from the standard under the Federal Constitution in one critical way. Under the New York standard, a criminal defendant must show only that counsel's error "affected the fairness of the process as a whole." *Cummings v. LaValley*, 582 Fed. Appx. 49, 50 (2d Cir. 2014) (citing *Rosario v. Ercole*, 601 F.3d

118, 124 (2d Cir. 2010)).  This standard is understood to subsume the federal standard because it is considered more protective of criminal defendants.  *Rosario*, 601 F.3d at 124 (citing *People v. Turner*, 5 N.Y. 476, 806 N.Y.S.2d 154 (2005).  Accordingly, the New York standard is consistent with *Strickland*, and a New York State court is not required to decide a case "in *Strickland* terminology" in order to conform with the federal standard.  *Cummings*, 582 Fed App'x at 50.

### B.     AEDPA Review of Ineffective-Assistance Claims on the Merits

The Appellate Division, Third Department rejected petitioner's ineffective assistance of counsel claims, finding that petitioner had not demonstrated that an actual or potential conflict existed, as it was "by no means clear that there was in fact any actual overlap in representation."  *Wilson,* 100 A.D.3d at 1048-49, 952 N.Y.S.2d at 841 (3d Dep't 2012).  In addition, the appellate court noted that the trial judge had questioned Attorney Cornelius twice regarding the matter, after petitioner had raised the issue for the first time mid-trial.  The appellate court concluded that under the circumstances, it could not say that the petitioner's defense was in fact affected by the operation of the asserted conflict of interest. The New York Court of Appeals denied petitioner's motion for leave to appeal.  *Wilson*, 22 N.Y.3d 998, 981 N.Y.S.2d 4 (2013).  Even if the state courts did not explicitly address all of petitioner's clearly asserted federal ineffective assistance claims in these decisions, the appellate decisions constituted a decision on the merits.  Accordingly, the state court's rejection of these claims must be reviewed under the highly-deferential AEDPA standard outlined above.  *Harrington*, 562 U.S. at 99-100.

## 1.    Conflict of Interest

The Sixth Amendment requires a criminal defendant to have "conflict free" counsel in order for counsel to be effective. *Woods v. Georgia*, 450 U.S. 261, 271 (1981).  Courts have recognized different types of conflicts: (1) a *per se* conflict, (2) an actual conflict, and (3) a potential conflict. *See United States v. Doe # 1*, 272 F.3d 116, 125 (2d Cir. 2001).  A *per se* conflict requires automatic reversal without a showing of prejudice, and only occurs if the attorney is not admitted to practice law or has been implicated in the same crime for which the defendant was being tried. *Id.*

An "actual conflict" occurs when, during the course of the representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action.  *Cuyler v. Sullivan*, 446 U.S. 335, 352 n.3 (1980).  An exception to the general *Strickland* rule occurs when a petitioner claims that his attorney had an "actual conflict of interest," in which the lawyer "actively represented conflicting interests." *Cuyler*, 446 U.S. at 348, *cited in Tueros v. Greiner*, 343 F.3d 587, 591-92 (2d Cir. 2003).  In such a case, petitioner need only demonstrate that the *actual conflict* "adversely affected his lawyer's performance" in order to establish a violation of the Sixth Amendment.  *Id.*

Finally, a "potential conflict" situation is one in which the interests of defendants in a case of multiple representation may diverge at some point so as to place the attorney under inconsistent duties. *Cuyler*, 446 U.S. at 356 n.3.  Where there is a potential conflict, the *Strickland* standard applies, requiring the defendant to show both deficient performance and prejudice.

In *Tueros*, the Second Circuit distinguished the two standards, stating that *Sullivan* "grants the defendant a 'limited[] presumption of prejudice.'" 343 F.3d at 592 (alteration in original) (quoting *Strickland* 466 U.S. at 692). The court began its discussion by stating that the case presented the question of which standard to apply, but recognized that, under the AEDPA, the issue still was whether the state court unreasonably applied clearly established precedent in order to determine that the defendant's counsel did not have an "actual conflict of interest." 343 F.3d at 592.

In this case, petitioner has failed to demonstrate an actual conflict of interest arising from Attorney Cornelius' representation. Petitioner was represented by privately retained counsel unaffiliated with the Greene County Public Defenders' office during court appearances in January 2010, April 2010, and January 2011 and at the January 2011 trial. Although petitioner cannot identify when his relationship with Attorney Cornelius ended, it is clear that any representation had ceased prior to the identification of Dennis Foster as the CI in April 2010, and prior to Foster's January 2012 testimony.

Petitioner has also failed to make any showing that Attorney Cornelius was representing Dennis Foster at the time of petitioner's December 2009 bail application hearing. During the trial, Foster testified that he was not represented by any counsel when he signed the agreement in April 2009. (Foster 44). While petitioner argues that Foster must have been represented at the time that he signed his April 2009 confidential informant agreement with the New York State police, he offered no proof to support this conclusion at any stage of the proceeding, or to refute Foster's

testimony on this point.

Even if petitioner had adequately demonstrated that an actual conflict existed, he still failed to show how his defense was diminished in any way during the course of Attorney Cornelius's representation. *Cordero v. Lee*, 574 Fed. App'x 39, 40 (E.D.N.Y. 2014). At the bail hearing, Attorney Cornelius presented petitioner's connections to the community and likelihood of appearing for trial while pointing out the weaknesses in the prosecution's case, including reliance on CI testimony. (BT 2-9). Petitioner has not shown any deficiencies in Attorney Cornelius's performance during the bail application hearing, nor any alternative legal strategies or arguments that should have been made.

Petitioner also alleges that, separate from the bail application hearing, Attorney Cornelius advised him that he had a strong incentive to contest the charges due to his immigration status. Petitioner does not explain why this advice was inaccurate. It appears that subsequent attorneys reached the same conclusion regarding petitioner's immigration status.[5]

Petitioner also alleges that the purported conflict of interest influenced his decision to reject a plea offer that would have resulted in two years imprisonment. (Pet. at 7). The Supreme Court has confirmed that the Sixth Amendment right to

---

[5] For example, Attorney Schlenker informed the court at the April 20, 2010 hearing that "I should point out to your Honor also that, particularly under the recent case of *Padilla*, there's very little room to discuss a plea negotiation. Mr. Wilson is a Jamaican citizen, and it's absolutely clear that if he's convicted of any crimes that - - for which he is charged, or any felony, he's going to be deported - - or removed, as the new word is - - back to Jamaica." (DT at 6-7).

effective assistance of counsel extends to the consideration of plea offers that lapse or are rejected. *Missouri v. Frye*, __ U.S. __, 132 S. Ct. 1399, 1407-08 (2012). The Supreme Court declined to specifically define and enumerate the Sixth Amendment obligations of defense counsel in this context, but held "as a general rule, counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* at 1408. The court in *Missouri v. Frye* held further:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law.

*Id.* at 1409.

There is no evidence that any plea discussions actually took place during Attorney Cornelius's brief representation of petitioner. Only two plea offers are described in the record. The first was an offer of two years imprisonment made in January 2011, which petitioner rejected after conferring with a different attorney. (SH at 2-3). Attorney Cornelius had no influence over this result. The second offer, which would have resulted in one and a half years of incarceration, was accepted by petitioner just prior to voir dire but rejected by the trial court. (TT Vol. I, 18-20). Therefore, petitioner has failed to show a reasonable probability that he would have accepted any plea offer made while represented by Cornelius in late 2009, or that a favorable plea agreement would have been approved by a court.

Accordingly, the state court did not unreasonably apply the law of the Supreme Court, as supplemented by the Second Circuit, in concluding that Attorney Cornelius did not provide ineffective assistance in connection with his brief representation of petitioner in 2009.

## II.    Confrontation Clause

### A.    Generally Applicable Law

A defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Pointer v. Texas,* 380 U.S. 400 (1965). The right to cross-examination is not, however, absolute, and a trial court may place reasonable limits on a defense attorney's cross-examination of a prosecution witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Young v. McGinnis*, 411 F. Supp. 2d 278, 302 (E.D.N.Y. 2006) (quoting *Van Arsdall*, 475 U.S. at 679 (citations omitted)). "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). Cross-examination is not improperly curtailed if "the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan Zapata*, 916 F.2d 795, 806 (2d Cir. 1990) (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.1980); *see Howard v. Walker,* 406 F.3d 114, 129 (2d Cir. 2005)

(quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

## B.     Application

Petitioner alleges that the trial court unconstitutionally limited his attorney's cross-examination of Dennis Foster, preventing the jury from receiving the defense's full theory of the case.[6] (Pet. at 11). The appellate division found that the "County Court permitted counsel to cross-examine the CI at length regarding his prior convictions, but limited the extent to which counsel could delve into the underlying facts of each conviction, reasoning that such minutia did not bear upon credibility and would serve only to confuse the jury." *Wilson*, 100 A.D.3d at 1047, 952 N.Y.S.2d at 840. This conclusion is supported by the record. Petitioner's trial counsel cross-examined Foster at length as to his drug addiction, criminal history, and the favorable plea agreement made in exchange for his cooperation and testimony. This included many issues that went to Foster's credibility, including being charged with stealing from his own mother. Where the court limited the scope of the cross-examination, it did so with regard to particular details about the crimes that the trial court, in its discretion, concluded would only confuse or distract the jury. These details included the make/model of a stolen television and the precise location of a store where Foster was arrested for forging a check.

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is

---

[6] As part of this claim, petitioner asserts that the "injustice" of the trial court's limitation on cross-examination was "further enhanced" by the lack of a jury instruction that Foster was an interested witness. (Pet. at 11). The propriety of jury instructions are generally a state law issue, *see Cupp v. Naughten*, 414 U.S. 141, 146 (1973), and petitioner does not allege any constitutional violation separate from the Confrontation Clause claim discussed herein.

23

concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." *United States v. Shvartsman*, 317 Fed. App'x. 68, 70 (2d Cir. 2009) (citing *Van Arsdall*, 475 U.S. at 679 (1986)).  This court finds that the trial court's decisions limiting discrete aspects of the cross-examination of Dennis Foster, while still allowing petitioner's counsel to raise issues relevant to credibility, did not rise to the level of constitutional errors, and the Appellate Division did not act contrary to Supreme Court precedent.  28 U.S.C. § 2254(a).

 **WHEREFORE**, based on the findings above, it is

 **RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is further

 **RECOMMENDED**, that a certificate of appealability be **DENIED**.

 Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**Dated:**  August 11, 2015

           Hon. Andrew T. Baxter
           U.S. Magistrate Judge